Wilkinson v. Sun Life. May it please the Court. Good morning. Good morning, Your Honors. Joshua Bacharach. I represent the defendant appellant in this case, Sun Life. This case involves the denial of disability benefits under RISA. The District Court concluded that Sun Life abused its discretion when it found that Mr. Wilkinson was not insured under the plan. In reaching that decision, the District Court failed to follow the law of the circuit in a few ways, significant ways. It accepted evidence from outside the administrative record, and it also placed an improper burden on Sun Life to conduct an investigation. But the real problem in this case is that the Court didn't apply the eligibility requirements that are unambiguously stated in this policy. To be eligible for coverage when this policy went into effect on May 1, 2004, Mr. Wilkinson had to be performing all of his job duties for at least 30 hours a week. The District Court decided that since he was receiving full-time salary, he must have been working. But we've cited to a number of cases in our brief that say that the fact that employer pays you full-time, and even if it considers you to be a full-time employee, doesn't mean you satisfy these types of eligibility requirements. I understand that aspect of your argument. I guess the first question is what standard of review did he apply to this denial of benefits? This is like the fourth time you all denied benefits, right? I'm sorry, Your Honor? This is like the fourth time you all denied benefits, right? After paying them for four years? Well, it only learned of the fact that he was not eligible after receiving some additional information, that employment lawsuit information, from Mr. Wilkinson which showed that he wasn't even working on May 1, 2004. Yes, it did also say that we found that he wasn't disabled physically, but then it said, no, based on new information, we are revoking that part of our denial. Your doctor said he was disabled. He was disabled, correct. But going back to the standard review, the judge promptly applied the standard review of abuse of discretion, is that right? The judge did apply the abuse of discretion standard, which means that all our decision has to be as reasonable, a reasonable one. I know counsel's arguing that it was a mistake that the de novo standard should apply, and I can get into that briefly. That argument's incorrect because the case he relies on, there was an SPD, a summary plan description only, that included that ERISA language on discretion. In this case, the language is in the certificate itself. If you go to Sun Life, and I've done this, and you pull up the certificate in this case, included with it at the end is the ERISA right statement with the discretionary language. So the district court correctly applied the abuse of discretion standard. So the real question is, was it an abuse of discretion? And the answer to that is no, because again, he has to perform every job duty. And one of those job duties is he had to occasionally lift a hundred pounds. On April 20, 2004, just a couple weeks before this policy went into effect, he went to see his cardiologist. And the cardiologist said he had cardiomyopathy. He had moderate to severe left ventricle dysfunction. And the doctor noted that just a month earlier, he had surgery. And after that surgery, he lost a lot of weight. And it wasn't a weight loss surgery. He just wasn't doing well. And the doctor said he's still recovering. So on that basis alone, we know he could not, it's been performing all of those job duties. There's no way he could have lifted that. But you're basing this just on your review of the litigation in New Jersey, not on the FLMLA form, not on the form submitted to you by Dolan and Treanor, not based on his complaint, not based on his doctor's statement, just based on what you read in the New Jersey case. Isn't that right? It had a lot to do with that, correct, because... So why aren't those things that the judge relied upon reliable evidence? And the Why aren't those things that we just, I just listed, reasonable things for the judge to look at in terms of the adequacy of the record that you had for selling the boot factory? Oh, the judge did reasonably rely, it was part of the record, the information from the New Jersey lawsuit. That was correctly before the court. And was the FLMLA form correct before the court? The FLMLA form was not before the court. Because? Well, because, frankly, because the claimant didn't provide it. And it's his burden of proof. This judge in this case said that Sun Life had a no stone unturned duty to investigate. That's contrary to every decision in this circuit. In Berry, in Lefebvre, this circuit has said that an administrator has no duty. Now, there's later on a Harrison case which imposed a very narrow interpretation, saying under circumstances that don't apply here, they may have to get information. But here's the important thing. Well, there are a lot of important things. Well, look at that. But the judge relied upon four different things to decide that it was supporting the claim to be granted and not denied an abuse of discretion by the company. Is that right? There's no way to reasonably interpret the evidence in that manner. And let me explain. I'll start with the FLMLA form. The FLMLA form only shows that he received his pay until May 7, 2004. But it was applied for in April 2004 before the Sun Life policy went into effect. So did he have a crystal ball? And he said in April, I know I'm going to become disabled in a few weeks. Let's look at also the fact that on that form, he said that he was taking a leave because of a serious health condition. He said this in April before the Sun Life policy went into effect. Why? Because we see in the Dolan and Traynor lawsuit that on April 21, there was the third or fourth meeting with Mr. Wilkinson because of his inability to work. And they called him in. And they said to him, Mr. Dolan said that he had to take leave now. And Mr. Wilkinson agreed. In context, he was working 60 hours a week before he got sick. His wife passed away. Yes. He asked to reduce his hours to 40 hours a week. And the parties had concern about that. So if he was working reduced hours, and half of 60 hours would be 30 hours, wouldn't it? If there was any evidence that he was actually doing that. The reason they were concerned was he wasn't even working 30 hours a week. And again, he couldn't have. We know he couldn't do that one job duty. And that immediately disqualifies him. But beyond that, what we have boxes off and on trucks was, what was his job? He had to train people. That was part of it. It's not a big company. But that's the Dolan and Traynor. We're not talking about some DOT description. The Department of Labor said, this came from Dolan and Traynor. They said one of his job duties is occasionally while instructing other people is he had to lift 100 pounds. And he couldn't. There's no claim that he could. But here's the big point here. So if you look at the FMLA form and it said he was stopping work because of a serious health condition, again, that's on May 7th. He said he's going to stop on May 7th. No, that's when the pay stopped. So he had to get FMLA leave to continue his health insurance. Your Honor, Judge Lee, there is no piece of evidence that this man did anything, that he showed up at work, that he did anything on or after May 1, 2004. And what are you basing that on? What's the evidence that you're basing that on? There are no time records. There are no time sheets. Sure. There's no email. So why isn't there email? He produced emails in connection with his other lawsuit, which means he kept copies of it. He had copies of it. He had access to this information from his other lawsuit. And by the way, the court relied on this case Bowers v. Lina in Minnesota. And in that case, what happened was the claimant produced an affidavit or and himself saying that although he was out of work due to illness, before that disability claim, he returned to work full-time. We don't have a similar affidavit in here. So the court relied on that case improperly. There's no similar affidavit here. I thought there was a statement by the partner submitted in connection with his claim, the statement he worked through May 7th, 2004. Is that right? There is a statement, last day actively worked. Now, I think... What does last day actively worked mean to you? Well, I agree. If he did, in fact, work, Your Honor, but it's clear that he equated getting his salary with working. But that's not the requirement. But you just spoke to me and said he worked until May 4th. I'm telling you... What I'm saying is that's what he represented and that's why the claim was approved. Did you want to go back to Dalton and Trader to find out? Yes, they did. And that was a mistake by the district court too. The court said we did not conduct a no stone unturned investigation, but we did. The judge looked at all those items. He had four different things he was relying upon to decide that the adequacy of the investigation conducted by the claims administrator was inadequate. If it's inadequate, Your Honor, the thing to do is you remand the claim back to the administrator to consider new evidence. You don't consider new evidence. There's no law in the Fourth Circuit that allows a district court judge to consider new evidence anew. None. This time, the administrator came up with four different reasons at four different times over a period of time. I think the district judge and the administrator had a chance at this. Well, they did, but at the end of the day, they said, no, we're not relying on this. What we're relying on is this one factor. Every time that he... Anyway. Well, Your Honor, I think you have to look at the final decision. The court decisions say you have to look at the process as a whole. So what's the basis I'm up here saying the judge is wrong? I'm up here saying the judge is wrong because he found that he was actually working full-time and he wasn't. So how do we know that? Well, look, I've already shown you one fact that he could not have been working because he couldn't lift 100 pounds. We've got the fact that in April, before this policy went into effect, he goes to the doctor and he has all these conditions. He does not return to a doctor again until one month after he stops working. So if his heart condition declines to a point so much where now he can't work in that two-week span after the Sunlight Policy goes into effect, he's incapable of working, isn't it reasonable to think that this man would have gone to a doctor and not waited a month? This is a heart condition, but we've got more. Well, if there's something in the medical record that indicates that, that's one thing. That maybe he was taking medication and his doctor told him to take it. And maybe after he got to that point, he was able to say, well, you know, I can't do this anymore, even working 30 or 40 hours a week. That would be nice if there was any evidence that he was working 30 or 40 hours a week. But we're dealing here with your statute of evidence, and the question is whether the absence of evidence on the claim administrator's side is sufficient to defeat the whole claim, isn't it? Yes, because it's his burden of proof. It's the claimant's burden to prove. Give us some evidence that you were actually there, that you did any work. Give us the name of somebody who saw you there. Give us a letter that you something. Give us anything, and there's absolutely nothing. So what's this mean, Your Honor? You just pointed out the fallacy in the district court's argument or position. It's shifted the burden to son life, and that's not the law of this circuit. I've said multiple times that he had four different pieces of evidence that he relied upon. All right, and let's look at some of that. So let's look at the Dolan and Treanor information. And we look at Mr. Wilkinson's own statement when he said, I was told to leave now, and I agreed. Well, that's piece one. That's pretty good. He said in several weeks, and they prepared a form for me within three weeks. It's three weeks after April 21, May 7. He said not that he would leave. He would say that they would prepare the paperwork in several weeks, and that paperwork is the FMLA leave, which allowed him to continue to get his health insurance, which was his major concern. But, Your Honor, let's look at another statement from that, his own statement, where he admitted that he worked on and off from August 2003 until March 2004. That's page 998 of the appendix. So look at that date, March 2004. Does that mean after March 2004, he then worked more? No. If he did, obviously, those meetings in late March and April wouldn't have happened. He's admitting here that he didn't work after March 2004, and we know that, too, from those series of meetings with Dolan and again, Your Honors, the fact that he continued to get salary doesn't mean he was working. So why would they pay a man? Well, he was a 22 percent owner of the company. He married one of the founder's daughters, and unfortunately, she passed away in August, which sent this whole thing spiraling. But it doesn't mean the fact that they felt sympathy and they paid him. Those aren't qualifications under the Sun Life policy, and it just boggles the that a person can be working for a week in a high-level position, and they can't identify anybody they spoke to. They cannot identify a single thing they did. There's no documentation. How long after the fact? Did you depose him? Well, it's ERISA, so we can't. So how long after the fact was it that he was called upon to make these representations? It was a few years later. Can you tell me what you were doing four years ago today? I could, because I would go back into my computer system, and I would look up the documents from that day. I couldn't tell you. I know that, Your Honor, but he worked for a large company, and that company kept records. He pulled up these e-mails and these discussions in his New Jersey lawsuit, so they existed, and he could have produced something, Your Honor. If it existed, he would have found it. Of course he would have found it, but he produced, again, there is zero evidence of any work, any confirmation that he worked between May 1st and May 2nd. I thought there was an e-mail correspondence between he and his partners that he had been working at least nine to five without describing specifically what he was doing. Am I wrong about that? I don't recall that, and as far as you look at page 207 of the record, it talks about the last seven months. My hours have been typically nine to five some days because of less medical problems, and I also work from home. That was his statement. His statement is not evidence? It is evidence. Of course it is, but he has obviously got an interest in this, so what we need is to find evidence confirming, okay, he says he did it, but does that statement even say I did all my job duties at least 30 hours a week? Does that statement identify a single one of those job duties? Go back to the FMLA request, which talks about the fact that in April 2004, you notified us we became aware of your need to take a family medical leave. Exactly. The way he began this leave beginning on about May 10th, that is not even the same as May 7th or May 1st, is it? That is another problem. Exactly. He is saying I am going to need leave then, but now it is this. You are either disabled or you are not. In April of 2004, he said I have a serious health condition. April, I have a serious health condition for which I need to take a leave. The only reason... Three weeks from now, four weeks from now. That is unreasonable in your view. Of course it is. How do you know that? For what has changed in his health condition? What changed? Absolutely nothing. Boy, that is what you say, but we do not have his medical record here. We do not know what his doctor told him to do. We do not know what medication he was taking. We do. April 20, 2004, two weeks before the Sunlight Policy goes into effect, and we know he has got severe cardiomyopathy, or he has got cardiomyopathy. He has got moderate to severe left ventricle dysfunction. His ejection fraction is 30%. It should be 45% to 55% at least. That is not a medical question, but I appreciate your argument. I appreciate what you are saying. So what I am saying, Your Honor, is there is no evidence that he did any work. So physically, he could not have. We know that from the April note. And logistically, he has admitted that he stops working in April before the Sunlight Policy goes into effect. There is no evidence that he actually worked. And I do want to, I am sorry. Your time has expired. You can take your rebuttal time now, or you can save it. I would like to save it. Thank you, Your Honor. Okay. Thank you. Thank you. May it please the Court, I am Norris Adams. I represent Stephen Wilkinson, the appellee in this matter. We agree with the, unsurprisingly agree with the District Court's decision to find coverage for Mr. Wilkinson. Just to begin with, Judge Lee's question at the beginning regarding standard of review, we do believe that this case goes, should be affirmed under either standard. But we do believe also that the incorrect standard of review was applied, that de novo would be appropriate in this case. The reason for that is, there's sort of a, at least the way I look at it, there's a three-part kind of analysis. One is, does the language, the discretionary language, is it sufficient? And we would concede that it is if it's part of the policy. So then the next issue is whether it's part of the policy. We would contend that it's not. There's nothing that links it to the policy. It's a separate agreement, it's a separate document. It's not numbered sequentially with the policy. It's not included in the table of contents of the policy. Table of contents ends on part 15 arbitration. It doesn't go on to this statement of ERISA rights, what we've been calling it. The numbering, like I said, is inconsistent. It begins by saying, if your employer's benefit plans are subject to the requirements of ERISA, the following provisions apply. So it's clearly a generic document that isn't specifically part of the policy. It also refers to an SPD. It says, if you have questions about your plan, refer to the SPD. And there's no SPD here. So there's nothing to connect it to the policy. And by the terms of the policy, it states, the group policy issued to the policyholder, together with the application of the policyholder, is the entire contract between us and the policyholder. Is the standard of view determined? Absolutely not. And that's why I'd like to move on to the merits. Thank you. So under any standard, abuse of discretion, which is what Judge Voorhees in the District Court applied, this, the, Mr. Wilkinson has coverage of this, for this, his disability. Contrary to counsel's statement, I don't believe that Judge Voorhees shifted the burden onto Sun Life. I do believe that the standard in the Fourth Circuit can be described in sort of three guiding principles that present kind of the lens in which we look at the evidence that's here. One is that Sun Life's evidence has to be the result of a deliberate, principled reasoning process and supported by substantial evidence. Two, must rest on good evidence, sound reasoning, and result from a fair and searching process. And three, because of the conflict of interest in being a payer and decider of claims, the evidence must be more strongly supported by both objective and substantial evidence. When you look at that standard, and once, and admittedly, Mr. Wilkinson has to meet that standard first. So what evidence did he offer? He offered a number, let me just kind of put it into two categories. There's one that he left, there's an assertion he left on April 21st, there's another assertion that he didn't work 30 hours. I kind of grouped those together with respect to the fact that he, whether he left on April 21st or on May 7th, Dolan and Traynor filled out the employer section of his LTD application with that date. They filled out the employer section of the New Jersey DOL disability application in a telephone call with Sun Life in February of 2005. They confirmed that date and they paid his salary, which I disagree completely that that was the grounds that Judge Borges ruled that was one of maybe a dozen pieces of information. And five, the FMLA form that you all have already discussed clearly states that we, and it doesn't say that you notified us only, it says also we became aware of the need to take FMLA leave and it connects it back to that April meeting starting about May 10th and it's needed for five weeks. Dolan and Traynor also confirmed it in the New Jersey lawsuit against Mr. Wilkinson. There are a half dozen or more references to his last date working being May 7th. Last date working as opposed to last date paid. Correct, Your Honor. Now, there's no losses which started this whole process the fourth time you reviewed his benefits, is that right? That's my reading of the record is they were, Sun Life was looking into the claim on sort of a regular basis, called Dolan and Traynor, found out about the lawsuit and then went in and looked into the lawsuit to find out to get the documents and that's whenever they felt like they had grounds to question whether or not he had worked as of May 1st. And I'll add also that it was about four years that they denied him, but they denied him initially on disability grounds. It was five years before they ever raised the active employee issue. So it was an even longer time period that they looked back at. That was raised for the first time in May of 2009 and they'd been paying him since August of 2004. So they referenced it in a declaration in motion to dismiss pleadings and so forth in the New Jersey lawsuit over and over again that it was May 7th. Not that they paid him salary until then that he worked there for them. And in the context of that dispute, not only are they adversarial to each other, but it would have behooved them to go back further because they were saying, hey, he didn't resign. Not only did not resign in September, he stopped working in May. So if he had stopped working further, I would submit that it would actually have behooved them to say that. And they never say that in any of the pleadings. Also, additional evidence from Mr. Wilkinson, he filed a declaration under perjury in the New Jersey case stating that date, his LTD application, his other life insurance applications with Security Mutual and Mass Mutual, the Social Security Administration, even testified in front of the Social Security Administration, New Jersey DOL. All of these places, he swore or attested that he had worked until May 7th, was an active employee until May 7th. And with respect to counsel's assertion that the declaration in the New Jersey suit that's cited to several times that it was self-serving, well, it wasn't because it was done in January of 2008. And this issue was never raised by Sun Life until 2009. So in the statement that Sun Life relies on that says he agreed to leave now, that was long before this decision was made. So it wasn't self-serving. Moreover, that particular passage is cited to, is quoted three times in the briefs. It's quoted almost verbatim except for, it leaves out a section in all three quotes. And the section includes a sentence, I'll read the whole quote, Timothy Dolan asked that I take a leave now. And they would continue to pay my salary until a written agreement was reached laying out the terms of my leave. I agreed to take the leave of absence with Tim Traynor's agreement that in a few weeks they would have a written agreement prepared for me. My health insurance would continue. Mike Dolan assured me that it was not about the money, that they could get along without income temporarily. And then an agreement concerning my terms of my leave would be worked out in a few weeks. This was admitted as well. Is April 21, May 7, 2004? Yes, Your Honor. And then there's another sentence. And then there's another sentence that's omitted in all three places. Based on their promise to work out an agreement within a few weeks, I began a medical leave for an undetermined period of time beginning May 7, 2004. Contrary to that agreement, my wages were terminated as of May 7, 2004. And I was put on an unpaid FMLA leave. That's a really important sentence. And it's omitted in every place. And it was omitted in the district court. And Judge Voorhees said, with respect to leaving that out, that Sun Life's statement that, quote, by Wilkinson's own admission, he ceased working on April 21, 2004, is without merit, a misrepresentation at most, an obfuscation at least. And yet still here in the appellate court, that sentence is being left off. And it's being left off because it gives context to the only thing that Sun Life is able to point to. I agree to leave now doesn't mean April 21, when the next sentence is, I began a medical leave for an undetermined period of time on May 7, 2004. Mr. Adams, beyond that, I guess the insurer is also suggesting that even if he was there physically on the 9 to 5 schedule, whatever the schedule might have been, that he really wasn't performing the duties of his employment. What's the evidence to suggest that he was? Your Honor, the insurer never raised that as part of their denial. They raised two grounds. One, you either weren't there on April 21st. And two, if you were, you weren't working 30 hours a week, maybe for a long time before that. There was no finding in any of the denial letters that said, we don't think you can do training. Lift 100 pounds. Or lift 100 pounds. None of that was part of the denial. That's being argued in litigation now. But it was never part of the grounds for the denial. There were only two grounds for the denial. One, you weren't here, you left on April 21st. Two, you were probably working less than 30 hours well before that, based on different clauses in your different statements. Mr. Wilkinson also let Sun Life know about the FMLA leave that he has left there back in October of 2004. That he had to leave because of his illness in May. Again, these are all times that preceded him ever having any reason to know that that was being questioned. Because it wasn't questioned for five years. And the FMLA form was referred to by the insurance company at least twice in denial. Is that right? So they knew about it. They knew about the FMLA form because it was referred to at least twice in the denial. And we know they knew about the FMLA form, A, because of that letter. But B, in their first appeal denial, they referenced it twice. In their May 2009 appeal denial, they referenced it twice on page 445 and 451. And then in his second appeal declaration, he said that Dolan and Treanor prepared a memorandum confirming his FMLA request was made at his request. So that's at least three instances they knew about the FMLA form. And that goes to the admissibility of the FMLA form. Because contrary to the argument of Sun Life, it is established law in this circuit that extrinsic evidence is admissible when two conditions are met. That's from the Helton versus AT&T case from this court. The two conditions are, one, that it is necessary, the evidence is necessary to adequately assess the Booth factors, which are the reasonableness factors that evaluate ERISA cases. And two, that evidence was known to the plan when it rendered its benefits decision. So there's no question the plan knew about it. They referenced it twice in their appeal letters. Mr. Wilkinson sent them a letter about it. And even on appeal, put it in his declaration. So the second question is whether or not it goes to Booth. District Court found that it does. District Court found that the third Booth factor, dealing with the adequacy materials considered, and the extent to which they support the decision, that it was important to that issue because it was a document that's highly probative. And in fact, I think Judge Voorhees called it the most compelling to the issue that was square in front of the court. Second, as to the conflict of interest, Judge Voorhees said that whether Sun Life acted purposefully or with an improper motive is less than transparent. In terms of why they didn't have the form in the administrative record. So it went to both of those issues. I would submit that it also goes to the fifth Booth factor, which is whether the decision making process was reasonable. There's additional... Can you tell me where in the record there's the denial letters? The denial letters, which one? All of them? Yeah. The first appeal denial letter is 444 to 453. And the second appeal denial letter is 260 to 271. Thank you. There's other evidence that further corroborates what... Could Mr. Wilkson lift 100 pounds? And should he have produced email? I don't know. He wasn't questioned. He was found disabled. Sun Life has never, until litigation, has never said... You know, and I don't even know how that would play into it in terms of... Did they make this argument in the district court? I'm sorry, Your Honor? Did they make this argument in the district court? I don't think so. I don't want to say that emphatically. The two issues have always squarely been, was he there on the 21st? Was he still there as of May 1? And was he working 30 hours? But doing all of the duties of his job, you know, simply because you go from 60 hours to 30 or 40 hours, doesn't mean you're letting off certain duties. It means you're maybe doing less of them. Whether or not he could have lifted the 100 pounds or whether or not that would have been considered all the duties, it was never a determination made by Sun Life. So I don't think we have that to... We couldn't have... We could have disputed it. Maybe there was never a situation in those last six months where he was required to lift 100 pounds as a training. Mr. Brooks was the vice president of the company, wasn't he? Correct, he was the vice president. Did the vice presidents lift boxes and move things around? Is that in this record here anywhere? There's nothing in the record that suggests whether he was doing that or could do that or was presented with an opportunity to do it and couldn't do it such that he was doing. As a director or vice president and manager over distribution and operations that had been there for 30-something years, I doubt that there's many occasion for him to be able to have to lift 100 pounds. Your representation to us is that this wasn't made... This wasn't a basis which the appellant made when they were denying benefits to him. That's correct, Your Honor. It was simply the April 21st date and the 30-40 hours. Quickly, some other evidence that was in there. There was a declaration by CPA that was in the trustee of the Life Insurance Trust. There were three AP statements by Dr. Rosenthal, all to that date. The Social Security Award, the New Jersey DOL Award, the Mass Mutual Date, Security Mutual Date, all applied May 7th. In terms of whether he was working the hours in the employer section of the LTD application, D&T said that he was working five days a week, eight hours a day. And this is a point that I've made in the brief, but I think it's an important one. In one of the emails that we've talked about, Mr. Wilkinson describes a suggestion made by Tim Dolan that he, quote, work part-time for less compensation. This was suggested by Tim D as possible, quote, temporary solution. If at that time in April, he was already not working full-time, there would have been no reason for one of his partners that was trying, you know, at this meeting to tell him, what about if you go out on part-time work? There just simply would have been no reason for that conversation to happen. He also said that his hours, as Judge Lee pointed out, have typically been nine to five. This is after working 60 hours a week. Reduce them to nine to five. Correct. No, that his hours have been typically nine to five leading up to that time. And then he said, my express desire to work, this was in the recap of the 413 meeting, to work 30 to four hours a week does not cut it with them. They are putting in extra hours evenings, weekends, and weekends, and it's not fair. So, it follows that if your request to work only 30 to 40 hours a week is rejected because they're working nights and weekends, there's no logical conclusion from that that you were working less than 30 hours a week. Right. Yes, Your Honor. There was also the enrollment forms and the IME that Dr. Raymond stated that he was working 60 hours and just couldn't do it anymore in terms of giving context to this reduction in hours that Mr. Wilkinson undertook. So, I think there is a substantial amount of evidence in the record. And rather than shifting the burden of proof to Sun Life, I think what Judge Voorhees appropriately did is under this court's precedent said, said, well, once he's met his burden of proof, it's incumbent upon you insurer as a fiduciary, you have the obligation to produce substantial proof. You don't have to necessarily buy everything. That's why insurers go out and order IMEs and do other things when evidence is submitted by claimants. But you can't just ignore the evidence. And that's what Judge Voorhees looked at this kind of body of what he had to work with, which given that it was five years later, I think it's a substantial amount of evidence that he was working both the 30 hours and working still in May, particularly given that most of the instances that we've looked at, he made before this was ever an issue. So, it's more inherently reliable because it wasn't self-serving. Bowers is supportive, but he made self-serving affidavits in that case. In this case, everything, because of the five-year delay, predates it. So, rather than having shifted this burden, I think the law here requires that Mr. Wilkinson, once he's met his burden, that Sun Life do the same, and they simply have not. Thank you. Thank you very much. Thank you. It seems to be his position that because there was the FMLA, that was the agreement referred to on page 999 of the appendix, the declaration. That was not the agreement that was referred to. He said that he would, in a few weeks, they would give him an agreement. And if you look at the paragraph above the one that counsel cited to, that agreement was supposed to outline the terms of his leave, including salary and health insurance. Well, that agreement was the separation agreement that happened in September of 2004. They were negotiating that, but there's no doubt that he left before that agreement was entered into. So, the FMLA is part of the discussion that would allow him to continue his health insurance. But that wasn't what he was waiting on to leave. And I keep going back to the fact that you're either disabled or you're not. And he said in April 2004, in that FMLA form, I have a serious health condition that prevents me from performing my job duties, my essential job duties. In April, before this policy went into effect. So, he was never covered. But there are other points that I really need to make here. He never explained how that FMLA form's admissible. And it isn't under the law of this circuit. It's outside the administrative record. Again, if the court said, you abused your discretion, you should have gotten that, which I don't think is the law of this circuit, then what he had to do, the judge had to do, is remand it to my client for review. Courts aren't allowed to be the first reviewer of information. And counsel even admitted, by the way, and on another point, that my client gave two additional reviews, gave a second appeal review. That's not necessarily even required. So, he did that. Why? He wanted to give a full and fair review. My client doesn't just willy-nilly deny benefits. It investigates. And in this case, yeah, it was hamstrung because the information from the claimant and his employer wasn't accurate in the beginning. But once they found it out, they asked for information. And again, it just boggles my mind that a company that has shipping records, that he's involved as vice president, yes, it's not a big company. So, he did have to do things like lift as part of his showing other people how to do their jobs. And that's, well, that's right there on page 499 of the record. Mr. Wilkinson's employer states that he was required to perform the following physical activities on a regular basis. Occasional lifting up to 100 pounds. That's... I don't know your rendition of what that said and what it does say. Maybe a little different. Well, that's exactly what it said. I just quoted it, Your Honor. I understand, but I was talking about your rendition, your description of it before you quoted it. Okay, I understand, Your Honor. Okay. But, so here's the other problems that we have here. He said, well, Social Security said he was disabled as of May 7th. Of course, because under Social Security regulations, you know, you can be in a vegetative state if you're still getting paid full salary, you're not considered disabled. That's why Social Security used that date. That's the last date he got paid. It's not evidence that he was actually doing any work. And that's the other problem, then, that we have. Can I ask you this question? Sure. Mr. Wilkinson, not this case, not Mr. Wilkinson, Mr. Jones. Mr. Jones took two weeks of sick leave. And then, after that two weeks of sick leave, applied for these permanent disability benefits. What would the result be? It depends on when the sick leave happened and when he came back. Two weeks before, I thought that was clear from my question. No. I'm so sorry. No. Two weeks before he asked for the long-term disability benefit. He took those two weeks as sick leave. If we're in the situation with Mr. Jones, where the policy became effective on May 1, 2004, but he was sick, those two weeks started before April, on May 1, 2004 in April, then he would not have been covered. And that's... Just ordinary sick leave. Yes. I think that that's not... Do you have any law that says that? Yes. McKay v. Reliance. It's a Sixth Circuit decision. It's a sick leave situation. And it disqualifies you from long-term disability benefits. Based on the eligibility requirements. Yes, Your Honor. Okay. That's the case. I'm sorry. What is the name of the case? McKay v. Reliance. It's a case that's in our briefs. And it dealt with the exact same situation there where... I'm going to go a little bit over. I apologize. But I just want to add this point. In McKay, the prior carrier was Unum. He stopped working while that policy was in effect. I'm not talking about stop working. I'm talking about be working, taking sick leave at your job. Have you never heard of taking sick leave when you're actually working? Come back. If he's not... And so McKay is right on point, right? Well, it doesn't deal with sick leave. It deals with a guy who's... Well, I'm not understanding the point because disability is the same. No, it's not. That's the whole point of the question. Sick leave is not the same as long-term disability. No, no, it's not. But you have to have an illness or disease to be able to get disability. But different ones. Different ones? The key is, in this case, the key under your factual scenario is this, Judge Motz. Under the policy language, he had to be performing all of his job duties at least 30 hours a week when the policy went into effect. In your situation, if that person was not, whether it's already on disability or if he's on leave, if he's not performing all of his job duties at least 30 hours per week on or after the effective date of that policy, he's not covered. And McKay holds that? Yeah, he's not covered. Okay. All right. And, Your Honor, we think at the very least, if I may just... Please. The fact that the court accepted this evidence from outside the administrative record found it to be the most compelling evidence and it should never have been considered. That alone warrants reversal of the district court decision, but counsel has not produced any evidence that this man actually worked. He can provide dates on applications. He can provide dates on forms. That's not the same as showing that he did anything at that office, let alone all of his duties. Okay. I don't want to be sure I have the same McKay case that you're talking about. This is the unreported case from the Sixth Circuit. That is correct, Your Honor. You don't have any other authority for that position that you would like to give me? Well, in our brief, we cite to a case called Elsie. We cite to several cases... It's definitive on this issue as well. Which talks about you have to be actually... You're right. Elsie, I think, used the word actual working. Correct, Your Honor. Okay. Thank you for allowing me the extra time. Thank you. You're welcome. Thank you, Your Honors. We'll come down and greet the lawyers and then go directly to our last case.
judges: Diana Gribbon Motz, Albert Diaz, Gerald Bruce Lee